UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------  X
                                                   :
  UNITED STATES OF AMERICA                         :
                                                   :
              - v. -                               :        S1 20 Cr. 470 (PKC)
                                                   :
  KENNETH WYNDER, Jr., and                         :
  ANDREW BROWN, a/k/a "Drew Brown,"                :
                                                   :
                Defendants.                        :
-------------------------------------------------  X
```

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Eli J. Mark
Assistant United States Attorney

- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    A.    The Charges and the Defendants' Trial ......................................................... 2

    B.    The Defendants' Criminal Conduct ............................................................... 3

        1.    The Defendants' Theft from Union Members' Retirement Accounts ........ 3

        2.    Lies to Union Members ................................................................... 6

        3.    Wynder's Tax Evasion ..................................................................... 6

    C.    The Impact of the Defendants' Conduct on LEEBA's Members ........................... 8

    D.    The Advisory Guidelines Range ................................................................. 10

        1.    Wynder's Applicable Guideline Range ............................................... 10

        2.    Brown's Applicable Guideline Range ................................................. 11

    E.    The Probation Office's Recommendations ...................................................... 12

DISCUSSION ..................................................................................................................... 12

I.    The Probation Office's Guidelines Calculations are Correct After Accounting for the New Amendments ................................................................................................... 12

    A.    The Probation Office Correctly Calculated the Loss from the Annuity Fund Fraud Scheme as to Brown ................................................................................. 13

II.    A Substantial Term of Imprisonment—Consistent with the Recommendations of the Probation Office—Is Warranted as to Each Defendant .............................................. 17

    A.    The Seriousness of the Offenses ................................................................. 17

    B.    The History and Characteristics of the Defendants Warrants Substantial Sentences ............................................................................................................ 19

    C.    The Need for General Deterrence is Strong in This Case .................................... 21

III.    The Defendants' Arguments Are Unpersuasive .................................................. 22

IV.    The Court Should Order Restitution and Forfeiture ............................................ 26

CONCLUSION .................................................................................................................... 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                            :

UNITED STATES OF AMERICA          :
                                            :

           - *v.* -              :         S1 20 Cr. 470 (PKC)
                                            :

KENNETH WYNDER, Jr., and        :
ANDREW BROWN, a/k/a "Drew Brown," :
                                            :

                Defendants.     :
-------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendants Kenneth Wynder, Jr. and Andrew Brown, a/k/a "Drew Brown" are scheduled to be sentenced on January 17, 2024, at 11:45 a.m. The Government respectfully submits this memorandum in connection with that sentencing and in response to defendant Wynder's sentencing memorandum (Dkt. No. 245) ("Wynder Mem.") and defendant Brown's sentencing memorandum (Dkt. No. 238) ("Brown Mem.").

## PRELIMINARY STATEMENT

As proved at trial, over the course of many years, the defendants, Wynder, a former law enforcement officer and president of a labor union, and Brown, the union's financial advisor, defrauded the union's members' retirement accounts, placing their own interests above those of the union members they had promised to serve. Through their theft of over $500,000 from the union's retirement fund, the defendants deprived hard-working union members of funds intended to assist them with their retirement. All the while, Wynder plundered the union for personal expenses and off-the-books income, on which he failed to pay taxes. Wynder and Brown then concealed and covered up those crimes when union members began asking questions. This was serious conduct that took place repeatedly over a number of years. It deserves serious punishment.

The United States Sentencing Guidelines ("Guidelines") appropriately reflect the defendants' lengthy, calculated, and repeated fraud. Wynder faces an advisory Guidelines range of 70 to 87 months' imprisonment, as set forth in the Presentence Investigation Report ("Wynder PSR") of the United States Probation Office ("Probation Office"), and Brown faces an advisory Guidelines range of 37 to 46 months' imprisonment, as set forth in the Presentence Investigation Report ("Brown PSR") of the Probation Office, after accounting for a more recent Guidelines amendment that went into effect after the PSR was completed. The Probation Office recommends a sentence of 54 months' imprisonment for Wynder, and a sentence of 34 months' imprisonment for Brown.

Considering all facts and circumstances of this case, given the nature and circumstances of the offense, the defendants' history and characteristics, and the need to promote respect for the law and general deterrence, the Government respectfully submits that a significant term of imprisonment consistent with the Probation Office's recommendations for each defendant is warranted.

## BACKGROUND

### A.  The Charges and the Defendants' Trial

On May 30, 2023, following a five-day jury trial, Wynder and Brown were convicted of all counts with which they had been charged in Superseding Indictment S1 20 Cr. 470 (PKC) (the "Indictment"). Specifically, Wynder and Brown were both convicted of wire fraud and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349, as charged in Counts One and Two of the Indictment. Wynder was also convicted of tax evasion and conspiracy to commit tax evasion, in violation of Title 26, United States Code, Sections 7201 and 371, as charged in Counts Three through Eight of the Indictment.

**B.  The Defendants' Criminal Conduct**

The Court is well aware of the trial record in this case, which overwhelmingly established that the defendants, over the course of many years, stole more than $500,000 from the Annuity Fund of the Law Enforcement Employees Benevolent Association ("LEEBA"), and that Wynder also committed tax evasion on off-the-books money he received from LEEBA.

1.  <u>The Defendants' Theft from Union Members' Retirement Accounts</u>

As demonstrated at trial, Wynder, a former New York State Trooper, was the founder and President of LEEBA, a labor union that represented law enforcement personnel at various agencies of the City of New York (the "City"). As a result of his role, Wynder controlled LEEBA and its benefit funds, the Annuity Fund and Welfare Fund, for which he served as a member of their boards of trustees. Wynder used his control over the union's finances to pay himself far in excess of his board authorized salary.[1] (Wynder PSR ¶ 13). These payments came in the form of cash and checks, as well as a Lexus luxury car, and a trip to Dallas for a Cowboys football game. By 2020, Wynder took approximately $220,000 in annual compensation from the union, amounting to more than triple his last Board-authorized salary of $72,000. (Wynder PSR at 5 n.2).

To ensure Wynder had sufficient funds to pay himself and the union's expenses, including insurance benefits for which Brown received a commission, Wynder and Brown, the union's benefits coordinator and financial advisor, withdrew steadily increasing amounts from the Annuity Fund under false pretenses and transferred the money into LEEBA's main operating account controlled by Wynder. (Wynder PSR ¶¶ 19, 23). For example, in 2017, Wynder and Brown

---

[1] Wynder also caused the Welfare Fund to pay for supplemental insurance benefits for him and his family, which was not permitted under the Welfare Fund's agreement with the City. (Wynder PSR at 5 n.1).

withdrew approximately $110,000 from the Annuity Fund under false pretenses, which amounted to more than half of the City's annual contribution to the Annuity Fund that was supposed to benefit union members.

Wynder hid these payments from the City by failing to file annual financial disclosures as required for the Annuity Fund under its agreement with the City and by obstructing the City's audit of the Annuity Fund. After Wynder stopped complying with the City's requests for information about the Annuity Fund (even after a Court ordered him to comply), in or about the fall of 2018 the City started placing contributions to the Annuity Fund into escrow. Nonetheless, Wynder and Brown's misappropriation of funds from the Annuity Fund only grew. In the first three quarters of 2019 (prior to the defendants learning about the Government's investigation), the defendants withdrew a staggering $160,000 from the Annuity Fund and transferred it to LEEBA's own accounts, even though all City contributions at that time were being placed in escrow. (Wynder PSR ¶ 19). Each of these withdrawals extracted substantial sums from the union's retirement accounts.[2] The scheme only came to an end after the Government's investigation became overt.

The evidence at trial clearly established Brown's role in conspiring with Wynder to defraud the Annuity Fund and steal money from the members' accounts. Between 2012 and 2019, Wynder and Brown together made 17 withdrawals from the Annuity Fund to LEEBA, totaling $529,000. (Brown PSR ¶ 18). Although Wynder had ultimate authority to make the withdrawals, Brown at times suggested and pushed Wynder to make them, under false pretenses. The withdrawals were

---

[2] For example, when Wynder and Brown stole $55,000 from the Annuity Fund during a particular quarter, it appeared as a fee of $353.34 on the quarterly statement for one LEEBA member. GX 1001 at 17-18. That same quarter, the City contributed $174.62 to that member's account – that is, Wynder and Brown stole almost twice the entire City contribution to that account. *Id.*; *see also* GX 1003, 1008.

accompanied by forms and invoices that were drafted by Brown, or staff members who completed the forms based on instructions from Brown about what to say in the forms, including what to say about the purpose for the withdrawal. Brown at times would change a suggested excuse for a withdrawal that Wynder had provided, prior to submitting it for processing to Ascensus, the Annuity Fund's administrator. Based on Brown's instructions, Brown's staff also generated invoices on LEEBA's letterhead that falsely stated the fabricated need for the funds. After the withdrawal forms were filled out and the Brown-generated LEEBA invoices were completed, Wynder would sign the forms, return them to Brown, and Brown or his staff would email or fax the withdrawal forms to Ascensus, along with the LEEBA invoices. Although Brown did not directly receive the proceeds of the withdrawals, some of these withdrawals helped pay for insurance benefits for which Brown received a commission as the insurance broker. Wynder was frequently late in paying those insurance bills causing significant problems for Brown's business, which motivated Brown to use money stolen from the Annuity Fund to pay those bills, thereby ensuring Brown received his commissions.

During the time when Wynder and Brown were stealing from the Annuity Fund, the Annuity Fund was audited by both the City and a private accounting firm hired by the Annuity Fund. The City audit, which could have exposed the fraud in a public report, was thwarted by LEEBA's lack of cooperation and its failure to submit required City filings. The outside accounting firm found that Brown "wasn't consistent in his responses" to the auditors, and Brown was slow to supply information to the auditors, thus impeding their ability to get complete and accurate information. (*See* Trial Tr. 348). Ultimately, the outside accounting firm identified the improper withdrawals Wynder and Brown were making, and instructed LEEBA to stop making such withdrawals and to pay the money back. In response, Wynder lied and claimed that he would do

so. Yet, Wynder and Brown continued unabated and, indeed, the amount of their withdrawals only grew larger over time after Wynder stopped complying with the City's audit. (Wynder PSR ¶ 19; GX 2208 at 1).

### 2. Lies to Union Members

In addition to their lies on the 17 withdrawal forms and to the auditors, Wynder and Brown each lied to LEEBA members and prospective members when asked about high fees in the Annuity Fund due to their withdrawals. For example, in August 2019, when a LEEBA member called Wynder to ask about the high fees in his account, Wynder told him that the money was taken out because "we needed some money for some legal fees, and you will be getting your money back." (Trial Tr. 406). Similarly, in mid-2019, when a different LEEBA member called Brown to ask about the high fees in his account, Brown told him that the money was a loan and was taken out "[t]o fight the City of New York in upcoming legal battles." (Trial Tr. 625). As set forth above, there were no legal battles with the City, and *upcoming* legal battles certainly were not an acceptable reason to take money from retirement accounts. The defendants told these lies to cover up their illegal theft of union members' retirement money.

### 3. Wynder's Tax Evasion

#### a. Income Off the Books

As the President of LEEBA, Wynder controlled LEEBA's finances and was a signatory on all of its bank accounts. Wynder capitalized upon his position—with the help of Steven Whittick, LEEBA's Treasurer and a co-defendant in this case who previously pled guilty—to divert hundreds of thousands of dollars of off-the-books payments to himself and to Whittick, and to other LEEBA employees. From approximately 2015 through at least the first three quarters of 2019, the evidence at trial established that Wynder obtained payments from LEEBA in various

forms, including cash and checks to himself, payments for the purchase of a Lexus car, and a trip to Dallas to watch football games, that were not processed through their payroll service (ADP). Wynder also arranged for similar payments to be made to Whittick, and to other LEEBA employees, which also were not processed through ADP. Wynder and Whittick thus caused LEEBA to fail to report those payments to the Internal Revenue Service ("IRS"), either as wages paid by LEEBA to its employees, or as income they received, in order to avoid personal income and payroll taxes pertaining to those payments.

### b.  *Underpayment of Payroll Taxes*

With respect to payroll taxes, including Federal Insurance Contributions Act taxes ("FICA"), Wynder, as LEEBA's President, had a duty and responsibility to collect, truthfully account for, and pay over to the IRS payroll taxes from the wages actually or constructively paid to the employees of LEEBA, including IRS payroll taxes from the wages that Wynder caused to be paid to himself and to his co-conspirator Whittick.

By helping to make off-the-books payments to himself, Whittick, and other LEEBA employees, the defendant not only enabled himself and others to under-report their personal income tax, but also caused LEEBA and these employees to underpay payroll taxes totaling approximately \$91,341.46 (half payable by LEEBA and half payable by the employees). (Wynder PSR ¶ 40).

### c.  *Failure to File Income Tax Returns and Tax Loss Calculation*

For each of the tax years 2015 through 2018, Wynder failed to timely file his personal income tax returns. During those years, Wynder failed to report any income to the IRS, including the off-the-books payments that he had arranged to receive at LEEBA. In total, Wynder evaded

7

paying incomes taxes on at least $511,044.16 of income (which was paid outside of ADP), resulting in a personal income tax loss to the IRS of $148,000. (Wynder PSR ¶ 44).

### C. The Impact of the Defendants' Conduct on LEEBA's Members

The financial and emotional impact of the Wynder's and Brown's crimes was wide-ranging. Their crimes gutted the retirement accounts of hundreds of union members, who personally feel the pain of that loss through delayed or less secure retirement. Numerous current and former LEEBA members, in their written victim impact statements to this Court, attached as Exhibit A to this submission, describe the various ways the defendants' crimes harmed them and the other hard-working union members.

- My benefit as a member was impacted by [the] union['s] reckless oversight of funds provided by the city. It clearly affected the annuity funds . . . . As a retiree this was funds that would help in paying bills or taking a much deserve[d] vacation. The funds [were] depleted to less than a dollar. This lack of honesty from the union representatives was a clear signal that their intention was not to help the members. . . . [Their conduct] effected my confidence in having a union that will protect my interest. (Exhibit A at p.11).

- LEEBA's membership does not have the peace of mind knowing they will have financial stability from their annuity [because] Kenneth Wynder and Andrew Brown swindled that [a]way from us. (*Id.* at p.6).

- Kenneth Wynder and Andrew Brown have financially burdened me, making me work longer than needed[.] … Very little money was returned to my personal account that should be triple what it is at now. (*Id.* at p.8).

- The money he [Wynder] has stolen and the trust he has broken will never be recovered or repaired. We have not received a single payment into that retirement account in over 5 years and will receive no interest or pay back of the money that was stolen. (*Id.* at p.9).

As these members explain, tragically, the many victims in this case have not and likely will never receive the money stolen from their retirement accounts back. And the members as a result were also deprived of the hoped for and expected growth and investment from money in a retirement account.

- We lost interest and compounding in the Annuity Fund. The Annuity Fund lost capit[a]l and initial investment growth from the overcharged fees within he fund accounts. There have been no deposits since 2018 into the annuity fund. I am close to retirement along with a lot of other members and will not have the available investment to recover the losses. (Exhibit A at p.2).

Apart from the financial hardship that the defendants' conduct wrought on the members, their lies—which they had other union members repeat—destroyed the credibility of their delegates and destroyed the trust of union members in their union.

- There were points in time where other members made claims that LEEBA was using the Annuity money. I would counter that statement claiming to know that the money never made it into LEEBA's hands and went straight into Ascensus. I trusted Kenny and Andrew and never considered that they would steal from us. This point is where my credibility with Union matters has been tarnished. I stood by their words with complete trust and was wrong. (Exhibit A, at p.1).

- The financial implications of these thefts are catastrophic, not only for me but for many of the vulnerable members of our union. Kenneth Wynder and Andrew Brown were trusted individuals who were expected to act in our best interests, and the impact of their inappropriate behaviors has far-reaching consequences that I cannot quantify. The questionable financial future created by these actions has left me with a deep mistrust of the union, and a sense of betrayal that is hard to reconcile. (*Id.* at p.6).

### D.  The Advisory Guidelines Range

#### 1.  Wynder's Applicable Guideline Range

The Probation Office determined that Counts One through Seven were grouped together for purposes of calculating the applicable Guideline range (Wynder PSR ¶ 34; U.S.S.G. § 3D1.2(d)), which resulted in a total offense level of 27 for Wynder, as follows:

- the applicable Guideline to the group was determined to be U.S.S.G. § 2B1.1, with a base offense level of 7 (Wynder PSR ¶ 64);

- pursuant to Section 2B1.1(b)(1)(H), 14 levels are added because the combined loss from the fraud and tax offenses was more than $550,000, but not greater than $1,500,000 (Wynder PSR ¶ 65);

- pursuant to Section 2B1.1(b)(2)(A)(i), 2 levels are added because the offense involved 10 or more victims (Wynder PSR ¶ 66);

- pursuant to Section 3B1.3, 2 levels are added because Wynder, the president of LEEBA and a member of the Annuity Fund's board, owed a duty to act in the best interest of the Annuity Fund and its account holders, but through his position, he abused a position of trust in a manner that significantly facilitated the commission of the offense (Wynder PSR ¶68);

- pursuant to Section 3B1.1(c), 2 levels are added because Wynder, during the course of the wire fraud offense had a leadership role in the offense, including having decision-making authority over the illicit withdrawals to be made from the annuity accounts and largely profited from the offense (Wynder PSR ¶ 69);

Because Wynder has no prior criminal history, an offense level of 27 results in a Guidelines range of 70 to 87 months. (Wynder PSR ¶ 123.)

2.  <u>Brown's Applicable Guideline Range</u>

The Probation Office determined that Counts One and Two were grouped together for purposes of calculating the applicable Guideline range (Brown PSR ¶ 60; U.S.S.G. § 3D1.2(b)), which resulted in a total offense level of 23 for Brown, as follows:

- the applicable Guideline to the group was determined to be U.S.S.G. § 2B1.1, with a base offense level of 7 (Brown PSR ¶ 61);

- pursuant to Section 2B1.1(b)(1)(G), 12 levels are added because the loss from the fraud was $529,000, which is more than $250,000, but not greater than $550,000 (Brown PSR ¶ 62);

- pursuant to Section 2B1.1(b)(2)(A)(i), 2 levels are added because the offense involved 10 or more victims (Brown PSR ¶ 63);

- pursuant to Section 3B1.3, 2 levels are added because Brown, a licensed insurance broker and financial advisor, owed a duty to act in the best interest of the Annuity Fund and its account holders, but through his position, he abused a position of trust in a manner that significantly facilitated the commission of the offense (Brown PSR ¶ 65);

Because Brown has no prior criminal history, the Probation Department calculated that an offense level of 23 results in a Guidelines range of 46 to 57 months. (Brown PSR ¶ 117).

Since the preparation of Brown's final PSR, a new Guideline provision became effective on November 1, 2023, which qualifies Brown for a two-level decrease in offense level, arising from the fact he has no prior criminal history and no qualifying aggravating factors. *See* U.S.S.G.

§ 4C1.1(a). As a result, as of the date of sentencing, Brown's corrected offense level is 21, resulting in an applicable Guidelines range of 37 to 46 months.[3]

### E.  The Probation Office's Recommendations

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendants' age and background, physical and mental health, the nature and circumstances of the offenses, and the objectives of punishment, deterrence, and promotion of respect for the law, the Probation Office recommends a sentence of 54 months' imprisonment for Wynder, along with $838,683.62 in restitution, and $529,000 in forfeiture, and a sentence of 34 months' imprisonment for Brown, along with $529,000 in restitution, and $3,049.08 in forfeiture. (Wynder PSR pp. 32-33; Brown PSR p. 38).[4]

### DISCUSSION

### I.    The Probation Office's Guidelines Calculations are Correct After Accounting for the New Amendments

Wynder does not dispute the Probation Office's Guidelines calculation. Brown advances two challenges to the Probation Office's Guidelines calculation, asserting that his total offense level should be only 17. (Brown Mem. 17). As an initial matter, Brown argues that he qualifies for a two-level decrease in offense level, which became effective on November 1, 2023, arising from the fact he has no prior criminal history, *see* U.S.S.G. § 4C1.1(a). Because this guideline provision was not effective when the final PSR was prepared, the Probation Office did not rely on it in calculating the applicable guideline range. (Brown PSR at 36). As discussed above, the

---

[3]  Wynder does not qualify for any such decrease under the new § 4C1.1(a), because of his leadership role under U.S.S.G. § 3B1.3.  *See* § 4C1.1(a)(10).

[4] The Probation Office's restitution calculations for Wynder accounted for interest on tax payments owed through the date of the original sentencing. (Wynder PSR ¶ 56). Accounting for interest through the current sentencing date, these amounts are slightly higher.

Government does not contest that Brown alone qualifies for that two-level reduction. Brown's other challenge is to the loss calculation. A ruling in Brown's favor on that challenge would result in an advisory Guidelines range of 24-30 months' imprisonment. (Brown Mem. 17). As set forth below, Brown's challenge to the Probation Office's loss calculation is wrong, although the challenge, even if correct, need not be resolved by this Court if it would not affect the defendant's sentence. *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).

### A. The Probation Office Correctly Calculated the Loss from the Annuity Fund Fraud Scheme as to Brown

Although Brown acknowledges he participated in all of the fraudulent withdrawals totaling $529,000, he contends that he did not know they were all fraudulent at the time, and that the loss should be offset by legitimate expenses incurred. Both contentions should be rejected, and the Probation Office's calculations should be adopted.

### 1. The Probation Office Correctly Calculated a Loss of $529,000

First, Brown claims that "the Government demonstrated at most that [Brown] understood that the withdrawals [from the Annuity Fund] in May 2019 and after, which totaled $105,000, were improper, in addition to a one-off $60,000 withdraw prior to May 2019 that was addressed in the Court's Rule 29 Opinion and Order." (Brown Mem. 18). Brown's contention is inconsistent with the trial record and the undisputed factual assertions in the PSR.

The evidence at trial demonstrated, as the PSR reflects, that Brown personally and substantially participated in the entire scope of the fraud, *i.e.*, $529,000. (Brown PSR ¶ 18). The

evidence at trial overwhelmingly established that Brown—an experienced, licensed, financial advisor—knew what fees could and could not be taken out of the Annuity Fund, and that he was not aware of any administrative expenses being incurred by LEEBA justifying these withdrawals, particularly in light of Ascensus's and the Third-Party Administrator's independent and complete administration of the Annuity Fund. The evidence of Brown's conduct in or about May 2019 was not the beginning of Brown's involvement in the fraud; rather, it was one piece of the proof, among others, showing that Brown had fraudulent intent when he facilitated all of the fraudulent withdrawals, including, among others, the October 2018 $60,000 withdrawal addressed in the Court's Opinion and Order denying Brown's Rule 29 motion.

Brown's assertion that he could not have joined the conspiracy from the start because he claims he did not have "visibility" into how Wynder *used* the money that was stolen from the Annuity Fund (Brown Mem. 19) should be swiftly rejected. The evidence supported that Brown knew that he and Wynder were providing fraudulent justifications to steal money from the Annuity Fund from the beginning of the conspiracy, which fully supports the loss calculation. Indeed, in connection with each of the fraudulent withdrawals, Brown generated a phony LEEBA invoice to support the withdrawal rather than attaching a bona fide vendor invoice of actual expenses incurred to administer the Annuity Fund. It is irrelevant to the loss calculation whether Brown knew how or where all of the stolen money was spent, although there was ample evidence that Brown did in fact know where some of the funds were spent, including on insurance that he generated commissions from.[5]

---

[5] Further, regardless of Brown's ability or inability to review the union's bank records, as the union's financial advisor and benefits coordinator, Brown understood that the City's contributions to LEEBA's Welfare Fund should have been sufficient to pay for all of the insurance benefits, if Wynder had been managing it properly in the first instance.

Moreover, even under Brown's own selective reading of the record (which should be rejected), Brown would still be responsible under U.S.S.G. § 2B1.1 for loss caused prior to the date he suggests he joined the conspiracy, because a conspirator should be sentenced for the full amount of loss caused by the conspiracy, if he knew or reasonably should have known the past loss amounts from the conspiracy. *See United States v. Miranda-Ortiz*, 926 F.2d 172, 178 (2d Cir. 1991) ("The late-entering coconspirator should be sentenced on the basis of the full quantity of narcotics distributed by other members of the conspiracy only if, when he joined the conspiracy, he could reasonably foresee the distributions of future amounts, or knew or reasonably should have known what the past quantities were."). Here, given Brown's essential role in all of the fraudulent withdrawals, even under his theory that he "joined" the conspiracy at some later point, he still knew or reasonably should have known, as the Annuity Fund's financial advisor, of the fraudulent nature of the conspiracy's prior withdrawals.[6]

### 2. The Probation Office Properly Did Not Offset the Loss With Any Expenses

Second, Brown argues that the loss should be reduced by the union's payments to the accountants for the Annuity Fund. (Brown Mem. 20). Under the facts here, there is no basis to reduce the loss amount by any services rendered by the accountants, because the Annuity Fund and its members did not receive any material value for those services. *See, e.g., United States v. Byors*, 586 F.3d 222, 225–26 (2d Cir. 2009) ("The Guidelines do not require a loss to be offset by any legitimate expenses, as defendant argues, but rather by 'value' that has been conferred on

---

[6] Similarly, even if the Court found that Brown joined the conspiracy at some point after it began, the full amount of the fraud is properly included in his restitution amount if the Court finds (as it should) that he "knew or reasonably should have known about some or all of the conspiracy's past [criminal conduct]." *United States v. Bengis*, 783 F.3d 407, 413 (2d Cir. 2015); *see also United States v. Fiumano*, 721 F. App'x 45, 52 (2d Cir. 2018) (citing *Bengis*).

victims in the form of money or property returned or services rendered."). Here, the victims did not get the benefit of the accountant expenses that the defendants incurred, which came about only after the City's Comptroller first started looking into LEEBA. The financial statements that the accountants prepared were littered with inaccurate information based on false representations that were supplied by the defendants, including their concealment of the wire fraud for which they were convicted. Indeed, the largest distribution to the accountants was on April 21, 2017, for $10,330, which paid for the initial erroneous, and long overdue, Fiscal Year 2014 financial statement that failed to properly disclose the improper withdrawals from the Annuity Fund, and which needed to be subsequently amended. Similarly, the auditors were not even able to render an opinion on the accuracy of the later, untimely Fiscal Year 2016 financial statement due to the defendants' lies and obfuscation. While it is possible that accountants' expenses could in different circumstances hypothetically offset a fraud loss, here, because the Annuity Fund participants did not receive any value for these expenses, which failed to disclose the fraud to the victims, these expenses should not be credited against the total loss amount.[7]

The Probation's Office's loss calculations therefore were correct.

---

[7] Even if accountant expenses could be used to offset the loss amount of $529,000, those expenses totaled at most $42,410, according to Brown (Brown Mem. 3). Therefore, even if this Court were to consider them legitimate expenses, they are not so substantial that they would result in a different Guidelines enhancement (*i.e.*, they would not cause the loss to go below $250,000).

II.     **A Substantial Term of Imprisonment—Consistent with the Recommendations of the Probation Office—Is Warranted as to Each Defendant**

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a substantial term of imprisonment.

    A.  <u>The Seriousness of the Offenses</u>

*First*, the nature and seriousness of the offenses and the need to provide just punishment warrant a significant sentence of imprisonment. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendants, experienced professionals, stand guilty of defrauding LEEBA's members' retirement accounts of hundreds of thousands of dollars held with the Annuity Fund, a serious crime. The defendants championed their dedication to the union members in working to grow their union, and it was precisely this reputation that the defendants relied on in trying to cover-up and conceal the fraud from their union members.

This was exceedingly serious, and deliberate, criminal conduct that occurred over the course of years, affecting hundreds of hard-working union members. In addition to the money they stole from the union members' retirement accounts, Wynder (through his control of the union's bank accounts) also unlawfully sought and received compensation far in excess of his board-approved salary, including through cash, checks, and payments towards a Lexus vehicle that he now owns. In addition, Wynder and his family also received benefits from the union's Welfare Fund to which they were not entitled. And, when the City attempted to audit the union's funds to determine if there was any misappropriation, Wynder stonewalled the union and shut down the audit, which caused the City to place all benefits in escrow, only further harming the union members he was supposed to protect.

In their submissions, the defendants repeatedly seek to minimize this egregious conduct, never genuinely expressing remorse or acknowledging the financial or emotional harm their conduct caused to the members. For example, while Wynder states that he "regrets" his decisions (Wynder Mem. 5), he also suggests that his actions were simply "mistakes" (*id.*) even though the jury found Wynder engaged in knowing and intentional misconduct. Wynder's actions were not simple inadvertence but calculated decisions by a union leader who placed his own greed and self-interest above those of union members. And Brown suggests that he did not see "anything wrong" with his conduct (Brown Mem. 19) and that he had a minimal role in the offense because he did not use retirement money for personal expenses, like car payments or the Dallas football trip, as Wynder did (*id.*). While Wynder's culpability was unquestionably greater, and his sentence should thus be higher, Brown held a position of trust with respect to the annuity fund and the members, and he played a critical role in fraudulently obtaining the funds from the annuity fund and then covering up the fraud to members who started questioning the withdrawals. Both defendants' lack of remorse and failure to accept responsibility for their stunning betrayal of trust further weighs in favor of a meaningful sentence of incarceration.

The impact of Wynder's and Brown's crimes was not merely limited to specific funds stolen from the retirement accounts of members. Numerous union members in their letters to this Court describe the wide-ranging impact of the defendants' conduct, which destroyed their confidence in the union and their sense of financial stability. The defendants not only stole money from these members, but they also stole the members' sense of security and confidence in their future.

In addition, tax offenses like Wynder's, are serious, costly, and damaging to our nation's system of taxation. *See United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal

18

tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). The orderly operation of government and our society relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government." *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (cleaned up). *See generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("[t]axes are what we pay for a civilized society. . . .") (Holmes, J., dissenting).

The tax offense at issue in this case has cost the United States Treasury, and the nation's honest taxpayers, not only the taxes that should have been paid on Wynder's off-the-books income (like cash, checks, and the Lexus he had LEEBA pay for), but the time value of the money—that is, the interest on the unpaid taxes. The offense conduct also resulted in significant losses to the New York State taxing authorities. There were no mitigating circumstances related to Wynder's deliberate and repeated tax evasion. Wynder's misconduct was not aberrant or prompted by a brief lapse in judgment, but was sustained over multiple years.

B. <u>The History and Characteristics of the Defendants Warrants Substantial Sentences</u>

*Second*, the history and characteristics of the defendants, the nature and the circumstances of the offenses, and the need for the sentence imposed to promote respect for the law warrant a substantial sentence for both Wynder and Brown. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The

defendants did not engage in fraud hesitantly or fleetingly. They did so for more than six years, in multiple ways, and without any apparent hesitation. Indeed, Brown came up with potential cover stories for expenses, revised ineffective justifications proposed by Wynder, and prepared phony invoices to support each withdrawal request. Further, both Wynder and Brown lied to union members who figured out or suspected that the union was stealing from their retirement accounts. In short, the defendants had plenty of chances to stop committing criminal conduct—but they chose to continue, notwithstanding that they were experienced professionals, and even in the face of an auditor expressly instructing the union to stop the withdrawals and repay them. The Court's sentence should reflect this fact. In addition, the Court's sentence should also reflect that Wynder engaged in other relevant misconduct, which, whether criminal or not, abused his position at LEEBA, hurt LEEBA and its members, undermined faith in unions, and was motivated by greed and a desire for prestige.

In addition, neither Wynder nor Brown has shown any genuine remorse for what they did or shown concern for LEEBA, its members, or the harm they caused, or even acknowledged that their actions and their choices are what led to their prosecution. On the contrary, the defendants' concerns appear solely focused on their own loss of standing, positions, and related consequences. (*See* Wynder Mem. 19-20; Brown Mem. 27). Brown for example asserts that it is the charges in this case that caused the loss of his business (Brown Mem. 27), instead of acknowledging that it was his own conduct that prompted the decline of his business.

The Government acknowledges that both defendants' backgrounds include mitigating factors and has taken them into account when crafting its sentencing recommendation. Although the Court may and should take those factors into consideration, they deserve no more weight than the Probation Office accords them. In other words, even taking those mitigating circumstances into

account, the Court should still impost meaningful sentences of incarceration on both defendants, along the lines of the recommendations of the Probation Office.

### C.  The Need for General Deterrence is Strong in This Case

*Finally*, the need for general deterrence strongly weighs in favor of a significant sentence for each defendant. *See* 18 U.S.C. § 3553(a)(2)(B). As described above, the defendants made it difficult to detect their long-running fraud or uncover its full scope. When such a scheme is successfully prosecuted, a substantial sentence is warranted to deter others who might otherwise be tempted to engage in similar conduct. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). The defendants' suggestions that they need not be sentenced to any prison time whatsoever to achieve robust deterrence (Wynder Mem. 13; Brown Mem. 26-27), flies in the face of case law, logic, and human experience. And, as the Court is aware, the need for deterrence for tax crimes, like the conduct engaged in my Wynder, is also particularly acute.

If the Court were to grant the defendants' requests for non-custodial sentences, it would send a very clear—and regrettable—message to the labor community (and the hard-working City employees that were the union's members) that this sort of criminal conduct will be treated with leniency and will not result in a prison term, even if the defendants refuse to accept responsibility

for their actions. By contrast, a significant term of imprisonment would send an important message to fiduciaries that legal and professional obligations take precedence over economic opportunities. The non-incarceratory sentences sought by the defendants would have a substantially diminished deterrent impact on an industry in need of one.

Indeed, as is made plain in the chart of recent cases, attached as Exhibit B to this submission, misconduct by those in positions of trust is, unfortunately, quite common. And as the sentences imposed in the cases attached in Exhibit B reflect, the Guidelines and the Probation Office's sentencing recommendations in this case are in-line with many of the sentences imposed in other recent cases involving similar white collar union misconduct. Indeed, Wynder's and Brown's own co-defendant in this case, Whittick, received a significant incarceratory sentence of 28 months imprisonment even after pleading guilty. To sentence these two defendants, who have failed to accept responsibility entirely and who engaged in a long-term fraud that harmed so hundreds of union members, would result in an unwarranted disparity and would fail to promote respect for the law. Nothing in the defendants' submissions warrants a substantial variance or downward departure from the applicable Guidelines here.

### III.    The Defendants' Arguments Are Unpersuasive

In their sentencing submissions, Wynder and Brown each requests a non-incarceratory sentence—a drastic variance from the Guidelines range and far lower than what the Probation Office recommends or the 28-month sentence of imprisonment imposed on their co-defendant, Steven Whittick, who pled guilty and was sentenced in November 2021, during the pandemic. Neither defendant deserves such a demonstrably inadequate sentence. In support of their requests, the defendants press multiple arguments. None warrants the extraordinary sentences that they seek.

22

*First*, Wynder and Brown both suggest that the impact on their family—including Wynder's wife who is suffering from serious medical issues, and Brown's parents—warrants a sentence of home incarceration. (Wynder Mem. 1, 7-9, 19; Brown Mem. 26). It does not. While the Government is certainly sympathetic to the defendants' family situations, the defendants' convictions—and their consequences—are the unfortunate but highly foreseeable ramifications of the defendants' choices. The defendants' argument is at odds with Section 3553(a), which focuses the Court's attention in imposing sentence on a defendant and the offense, not the impact of incarceration on a defendant's family. *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (same); *see also Koon v. United States*, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  Although, as noted above, the Government recognizes that these mitigating circumstances may warrant a slight variance along the lines recommended by the Probation Office, they do not justify the huge variances sought by the defense.

*Second*, Wynder and Brown each describe certain physical and psychological conditions from which they suffer. (Wynder Mem. 9-12; Brown Mem. 26). It is of course wholly appropriate for the Court to take these into account, but none appears unique for someone of their age or uncommon for someone convicted of serious crimes.  None prevented the defendants from committing their crimes, and all can be treated appropriately in prison, contrary to their conclusory assertions, in support of which they cite nothing other than a 16 year-old report (Wynder Mem. 11), that they have the sort of medical needs for which they are "not likely to receive effective medical care in a Bureau of Prisons facility" (*id.* at 11). As the Court is aware, the Federal Bureau

23

of Prisons is capable of handling such conditions, including, if need be, in a Federal Medical Center (although the defendants' conditions appear both stable and manageable).

*Third*, Wynder and Brown assert that the need to "avoid unwarranted disparities" among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), warrants a sentence in this case of time served. (Wynder Mem. 16-19; Brown Mem. 28-32). The cases cited by the defendants do not support the relief they seek. For example, in both cases cited by Wynder (*United States v. Mullins*, No. 20 Cr. 120 (S.D.N.Y.) and *United States v. King*, No. 10 Cr. 122 (S.D.N.Y.)), the defendants pled guilty, accepted responsibility for their conduct, and, although they received downward variances, both received meaningful terms of imprisonment. Mullins had a lower Guideline range than either Wynder or Brown (33 to 41 months' imprisonment), and was sentenced to a term of two years' imprisonment. King had a Guideline range of 96 months' imprisonment (the statutory maximum for the crimes she was charged), and was sentenced to 72 months' imprisonment.  In other words, these cases stand for precisely the opposite proposition for which the defense cites them: both support the notion that white collar criminals who abuse positions of trust warrant prison sentences.

Wynder also cites to a chart of what he claims are "similarly situated defendants" who were sentenced to terms between two years' imprisonment and probation (Wynder Mem. 17-19), and Brown cites to certain other cases that he claims reflect defendants that were more culpable than he.. Wynder's chart of supposedly similarly situated defendants is drawn from a list of "other defendants" who were convicted of financial crimes as a result of investigations by the Special Inspector General for the Troubled Asset Relief Program (SIGTARP). (Wynder Mem. 17 n.14). None of these defendants was apparently convicted of crimes related to defrauding a union or union members' retirement accounts or tax crimes, and there is no apparent similarity between

their offenses and Wynder's. Both defendants also omit numerous other cases involving defrauding a union and its members (or tax fraud cases) in which defendants received far above what they seek, such as some of the cases in the chart submitted by the Government as Exhibit B.

None of this is to say that this Court should reflexively impose the same or a similar sentence to that imposed in other cases, or imposed upon co-defendant Steven Whittick. Wynder and Brown should be sentenced for who they are and what they have done, regardless of the sentences imposed in other cases. But to the extent that the defendants ask this Court to consider other cases, they do not support their extraordinary requests.

Brown also suggests that the treatment of other individuals connected with LEEBA supports the relief he seeks. Neither individual referred to by Brown—Steven Whittick or ⬛⬛⬛⬛⬛⬛⬛⬛⬛—support the arguments he makes.[8] While Brown is correct that Whittick, who received a substantial sentence of 28 months' imprisonment, engaged in conduct that in certain aspects was more culpable than Brown because Whittick directly misappropriated money from the union (upon which he then avoided taxes), Brown played a critical role in the theft of hundreds of thousands of dollars from the union's retirement accounts—a crime that Whittick did not commit. Whittick also, in contrast to Brown, pled guilty and was remorseful for his misconduct. ⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.[9]

---

[8] The Government has redacted from the public filing of this submission references to ⬛⬛⬛ to protect ⬛ privacy interests, as a third-party who was not charged with any wrongdoing. *See United States v. Amodeo*, 71 F.3d 1044, 1052 (2d Cir. 1995).

[9] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

*Fourth*, the defendants describe charitable and other public-minded acts in which they have engaged. (Wynder Mem. 3-4, 20; Brown Mem. 7-9). It is appropriate that the Court consider these acts. But the law accords with common sense. Such acts warrant a downward departure only where they are "present to an exceptional degree or in some other way makes the case different from the ordinary case where [they are] present." *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)). *Cf., e.g.*, *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"). In any event, while the defendants' good works may be one of the factors the Court considers in fashioning a sentence, they do not warrant the extraordinarily low sentences that they seek.

## IV. The Court Should Order Restitution and Forfeiture

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires mandatory restitution in criminal cases where the offense is "an offense against property . . . , including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), and where "an identifiable victim . . . has suffered a . . . pecuniary loss." *Id.* § 3663A(c)(1)(B). Under the MVRA, restitution must be ordered "to each victim in the full amount of each victim's losses . . . ." 18 U.S.C. § 3664(f)(1)(A); *United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir. 2008).

Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires that, "[a]s soon as practical after a verdict . . . of guilty," the Court "determine what property is subject to forfeiture under the

applicable statute." *Id.* Where, as here, "the [G]overnment seeks a personal money judgment, the [C]ourt must determine the amount of money that the defendant will be ordered to pay." *Id.*. The Court is only required to "make a reasonable estimate," based on "the available information." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). And because forfeiture is "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), "[s]entencing courts determine forfeiture amounts by a preponderance of the evidence," *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). Here, as a result of committing the offenses charged in the Indictment and pursuant to 18 U.S.C. § 981(a)(1)(C),[10] the defendants must forfeit to the Government "[a]ny property, real or personal, that constitutes or is derived from proceeds traceable" to the commission of his offenses.

As reflected in the each PSR and the victim impact statements, the defendants inflicted substantial damages to the Annuity Fund and the union members' retirement accounts. The Probation Office appropriately calculated restitution in the amount of $529,000 for this conduct, which is joint and several between Wynder and Brown. In addition, Wynder separately avoided payroll taxes for LEEBA and its employees on income that was paid outside ADP, which results in an additional amount of restitution to the IRS, for both the payroll tax evasion, which is joint and several with co-defendant Whittick, and for personal income tax evasion, which is solely Wynder's responsibility.[11]

---

[10] "While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c)." *United States v. Stevenson*, 834 F.3d 80, 85 (2d Cir. 2016).
[11] The restitution calculations for the IRS in the PSR, included interest through the date of originally scheduled sentencing. (*See* Wynder PSR ¶ 56). The Government has requested from the IRS updated restitution calculations through the date of the current sentencing, and will incorporate them in a proposed restitution order for this Court prior to sentencing.

In addition, as reflected in each PSR, the defendants personally benefited from the theft from the Annuity Fund, which profit is subject to forfeiture. The Probation Office appropriately calculated forfeiture in the amount of $529,000 as to Wynder, and $3,049.08 as to Brown (Brown PSR ¶ 132), reflecting the amount in commissions Brown received after stolen money from the annuity fund was used to pay overdue insurance premiums.[12]

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that sentences of incarceration consistent with the recommendations of the Probation Department are appropriate and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

DATED:       January 10, 2024
             New York, New York

                         Respectfully submitted,

                         DAMIAN WILLIAMS
                         United States Attorney

                  By:  /s Eli J. Mark
                         Eli J. Mark
                         Assistant United States Attorney
                         (212) 637-2431

---

[12] The Government will submit proposed forfeiture orders for this Court's consideration prior to sentencing.